UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOHN RONALD ESPIE,

     Petitioner,

                                      Case Number 07-12506-BC
v.                                      Honorable Thomas L. Ludington

THOMAS BIRKETT,

     Respondent.

_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY OR LEAVE TO APPEAL IN FORMA PAUPERIS

Petitioner John Ronald Espie, presently confined at the St. Louis Correctional Facility in St. Louis, Michigan, filed a pro se application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on June 12, 2007. Petitioner was convicted by a jury in the Shiawassee County Circuit Court of first-degree murder, Mich. Comp. Laws § 750.316,[1] and received a statutory sentence of life imprisonment without the possibility of parole. Although Petitioner was sixteen years old at the time of the offense, he was tried and convicted as an adult pursuant to Michigan's automatic waiver statute, Mich.Comp. Laws § 769.1.

Petitioner contends that his sentence should be vacated because the prosecutor improperly elicited prior bad acts evidence; the prosecutor committed misconduct; the automatic waiver portion of the 1996 Juvenile Justice Reform Act is unconstitutional; Petitioner was denied the right to the effective assistance of appellate and trial counsel; Petitioner's right against self-incrimination was violated; the trial court judge violated Petitioner's right to due process by informing the jury that

---

[1] Petitioner was also convicted of carjacking, but this offense was vacated on Double Jeopardy grounds at sentencing.

there was probable cause to believe that Petitioner was guilty; the trial court judge erred in denying Petitioner's motion for a directed verdict; the great weight of the evidence was insufficient to convict; and that Petitioner's right to be free from warrantless searches and seizures was violated. The Respondent filed an answer to the petition, asserting that the claims are procedurally defaulted and/or lack merit. For the reasons stated in this Opinion and Order, the petition will be denied.

## I

In January of 1998, Petitioner was placed on probation by the Shiawassee County Probate Court for an unrelated offense. In November of 1998, Petitioner's probation was revoked after Petitioner stole his mother's car and checkbook and fled to the state of Virginia with his fourteen year old girlfriend, Heather Jones. Petitioner was remanded to the custody of the Bay County Juvenile Detention Facility. Trial Tr. II, pp. 195-96; 198.

Petitioner was then transported to that facility from the Shiawassee County Probate Court by the victim, Nathan Nover. *Id.* at pp. 198-99. At the time of his death, Nover had earlier suffered a heart attack and undergone open-heart surgery. Nover had diabetes and was insulin dependent. The diabetes adversely affected his legs by making walking difficult. Id. at pp 53-54. Nover retired after thirty-four years with General Motors, and thereafter worked on a part-time basis for the Shiawassee County Juvenile Court, transporting juveniles, under the supervision of that court, pursuant to orders of the court. *Id.* at pp. 9-10. Before his murder, the victim had transported juveniles for the court approximately eighteen times and there had never been any problems or complaints made against the victim in the course of his employment. *Id.* at pp. 9-13.

Following his placement in the Bay City Youth Detention Facility, Petitioner's mother made an appointment to have her son psychologically examined at the Abbott Road Center for the Family

located in East Lansing, Michigan. This testing was approved by the staff of the Probate Court. Trial Tr. II, pp. 199-200. Rachel Beckley, Petitioner's probate case officer, made arrangements for the trip to East Lansing and informed the victim on Monday, November 23, 1998, that he would be asked to drive Petitioner from Bay City to East Lansing and back on Wednesday, November 25, 1998. *Id.* at pp 201-02. Beckley added a handwritten note which instructed Nover to "please handcuff him to and fro." Beckley gave that instruction because Nover was known to be soft-hearted and Petitioner was considered a flight risk. *Id.* at pp. 204-05.

After learning that he would be going to East Lansing, Petitioner wrote a letter, dated November 23, 1998 at 4:15 p.m., to his girlfriend, and mailed it to her from the Bay City Juvenile Detention Center to her mother's home. That letter was read into the record as evidence of Petitioner's intention to steal a car and escape during the trip from Bay City to East Lansing. It provides in part

> On Wednesday I'm going to East Lansing for an appointment, and I'm sorry to say that's when . . . I have to break that promise I made to you. I'm sorry, baby, but I've got to. . . . I want you to do something for me. Friday call Staunton at 723-1134. He should be back from vacation about noon. He really wants to talk to you! He wants you and Nick to go with him down south for a couple of weeks, maybe longer. . . . Baby, I love you with all my heart, we will be together soon, real soon, I miss you—or I promise. Can't write more, but I wish I had time.
>
> I love you so much, baby. You're forever in my heart and thoughts, John Espie.

(People's Exhibit 35, Trial Tr. IV, pp. 137-40).

Heather Jones testified that the promise referred to by Petitioner in his letter was likely a reference to his promise that he would serve his time in the juvenile facility and not attempt to escape. Jones explained that Petitioner's references in the letter to "Staunton" and "Nick" indicated that she would see Petitioner and his friend Nick soon, even though he was not scheduled to be

released from the juvenile facility. *Id.* at pp. 154-55.

Petitioner told several inmates at the youth correctional facility that he was not coming back from his psychiatric evaluation. Petitioner informed a fellow inmate named Alex Barich that he was going to slip out of his handcuffs, as he had done before, and was going to steal a car. Petitioner told Barich that he intended to go to Florida after escaping. Petitioner told Barich and a couple of other inmates that he was facing numerous other charges in probate court and feared that he might be charged as an adult. *Id*. at pp. 127-28.

On the morning of November 25, 1998, Nathan Nover picked Petitioner up at the Bay City Youth Detention Facility in the early morning with his own motor vehicle. Nover transported Petitioner to the psychological evaluation site in East Lansing, Michigan. After a full day of examination, Petitioner was turned back over to the custody of Nathan Nover at approximately 5:00 p.m. and the two of them left the clinic in East Lansing. Tr. III, pp. 31-32. Nover was never again seen alive. At approximately 10:30 p.m., Nover's wife notified the sheriff's department, after the he failed to return home. The Nover family also notified the credit card company of Nathan Nover's disappearance. The company began monitoring activity on the card, enabling the police to track Petitioner's activities after leaving East Lansing. Review of the credit card activity disclosed that Nathan Nover's credit card was used late on November 25, 1998 at the Meijer's store in Corunna, Michigan, to purchase $126.97 worth of items. Credit card records showed that the card was used again at a Meijer's store in Indianapolis, Indiana on November 26, 1998 to purchase $68.49 worth of items, at a Meijer's store in Fort Wayne, Indiana the same day in the amount of $132.41, and later at a Holiday Inn in Angola, Indiana. Trial Tr. II, pp. 244-45.

The emergency flag placed in the computer system on the use of the victim's credit card led

to Petitioner's arrest at a Holiday Inn in Terre Haute, Indiana. Petitioner checked into the Holiday Inn and encountered the supervisor, Ms. Jennelle Cook. When Ms. Cook entered the victim's credit card into the computer, a notice on the machine instructed her to contact the credit card company. Trial Tr. III, pp. 125-26, 128. The credit card company authorized Cook to rent a room to Petitioner. *Id*. at p. 129. The credit card company security office then contacted the Michigan Department of State Police to alert them that they had finally located the suspect based on his credit card usage. Ms. Cook received a phone call from the Michigan State Police who told her that they were going to call the Terre Haute Police Department to seek their help. A short time later, several officers from the Terre Haute Police Department came to the hotel. *Id*. at p. 131. The police went to Petitioner's hotel room and knocked on the door. As Petitioner opened the door, the officers forced their way inside and pushed Petitioner up against the wall. As the police handcuffed him, they asked, "where is the C.O. [corrections officer]?" because the officers knew the victim was an insulin-dependant diabetic and believed that they were dealing with a life threatening emergency. Petitioner responded, "I don't know. I freaked out and choked him." The officers then asked Petitioner if he remembered where he left the victim, to which Petitioner replied, "somewhere in Michigan on a dirt road, and I left him gurgling." Petitioner also informed the police that the victim had tried to molest him. *Id.* at pp. 139-46.

Terre Haute Police Sergeant Carol Bowman then arrived at the hotel room and asked Petitioner where the victim was. *Id*. at p. 157. In response to this question, Petitioner gave Sgt. Bowman a long answer in which he described how the victim, after leaving East Lansing, and while still driving, had reached over, touched Petitioner's genital area, and told him that he was sure Petitioner would enjoy the contact. *Id*. at p. 158. Sgt. Bowman and several other officers also

testified that Petitioner stated that Nover had referred to him several times as a "gay criminal." Based on his description of the incident, Sgt. Bowman assumed that Petitioner was describing a situation in which he was sitting in the front passenger seat of the victim's vehicle. *Id.* at pp. 160, 62. Petitioner claimed that in response to this purported sexual contact, he wiggled his arms from behind his back and under his legs so that he was able to get his hands in front of him. Petitioner claimed that while still handcuffed, he placed his hands around the victim's neck and choked him. Petitioner told Sgt. Bowman that he choked Nover a first time and the victim made a "gurgling" and spitting sound after Petitioner heard a snapping or a popping sound. Petitioner told Bowman that he placed the victim in the back seat of the vehicle, got behind the wheel, and began driving. While Petitioner was driving, the victim began making noises and moving around on the backseat. Petitioner stated that the victim attempted to grab Petitioner from behind. Petitioner stopped the vehicle, turned around and choked the victim a second time. Petitioner told Sgt. Bowman that after choking the victim a second time, he left the victim lying by the side of a dirt road in Michigan. *Id*. at pp. 163-65. Petitioner did not tell Sgt. Bowman that he had stopped at three different Meijer's stores and had purchased seat covers and stereo enhancement equipment for the car which he had taken from the victim. *Id.* at pp. 166-68.

Petitioner was subsequently taken to the police station in Terre Haute where he was again interrogated. Prior to interrogating Petitioner, the police contacted Petitioner's mother by telephone. After speaking with Petitioner over the telephone, his mother gave the police permission to speak with Petitioner. Petitioner was then read his *Miranda* rights and agreed to waive his rights and speak with the police. During the ensuing interrogation, Petitioner's mother was allowed to listen by telephone. *Id.* at app. 187-90. Petitioner told Detective Manley that shortly after leaving East

Lansing, the victim began making comments about Petitioner being a "gay little criminal." Petitioner told Detective Manley how the victim first pulled off onto a side road and stopped the vehicle before unbuckling his seat belt, turning around, and reaching for Petitioner's left leg. Petitioner described how he brought his handcuffed hands around to his front and "snapped and started choking Mr. Nover with his handcuffs on." Petitioner indicated that the next thing he could remember was driving the vehicle with Mr. Nover in the backseat. Petitioner claimed that he drove the vehicle with handcuffs on. When Nover regained consciousness and tried to put Petitioner in a bear hug from behind, Petitioner turned and choked the victim a second time until he became unconscious. Petitioner then took the handcuff keys out of Mr. Nover's pocket, removed the handcuffs, and threw them behind the passenger seat. Petitioner indicated that he eventually "dumped Mr. Nover out" at the end of a dirt road. When Detective Manley's supervisor, Sgt. Seliger, began to use a harsher tone with Petitioner, Petitioner exercised his rights to terminate the interview. After terminating the interview, no police officer asked any questions of Petitioner. However, while waiting for the transport officer to take him back to the detention facility, Petitioner spontaneously stated to Detective Manley, "do you think I'm gonna say I killed him for the hell of it?" During the entire interview with Detective Manley, Petitioner never informed the police officers that he had purchased auto accessories and other items with the victim's credit card at several different Meijer's stores. *Id.* at pp. 192-99.

The Terre Haute police inventoried all of the items found in the hotel room with Petitioner, as well as the victim's car. Petitioner had told various people that he purchased seat covers for the car was because the victim had urinated on the car seats while being choked. However, several police officers who searched the vehicle, as well as members of the Nover family after they regained

possession of the vehicle, testified that no one could detect the presence or odor of urine in that car. Detective Mundy examined the victim's car and found no evidence to suggest that any form of violence had occurred inside the car, nor did he observe any aroma of either vomit or urine or any spotting or staining on the seats of the vehicle which would have suggested vomit or urine. Trial Tr. III, pp. 235-36; Tr. IV, p. 14.

While Petitioner was being interrogated in Indiana, an intensive search was being conducted by several law enforcement agencies and volunteers along the I-69 corridor between Shiawassee County and the Indiana border. After eight days of searching, two volunteer workers searched a dead end road in Michigan, approximately 19 miles north of the Indiana border, where they discovered the victim's body. Trial Tr. IV, *See* Testimony of Michael Law and Mitchell Coyne. Michigan State Police Sgt. Philip Mainstone came to the scene where Coyne and Law had found the victim's body. Sgt. Mainstone testified that based on his fifteen years of experience as a state police detective, it was his opinion that a serious effort had been made to conceal the victim's body. The victim's body was found approximately ten feet off the side of the road and his body had been covered with a layer of leaves that was not a natural accumulation. Trial Tr. IV, p. 49. Upon first observing the victim's body as it lay beside the road, the only part of the body that was observable was his hand with two distinctive rings which assisted in the identification. Sgt. Mainstone's indicated that in his opinion the body position and location was inconsistent with the description provided by Petitioner—suggesting that he had simply pulled to the side of the road and dumped the victim's body out of the car. *Id.* at p. 51.

Forensic pathologist Dr. David Start performed an autopsy on Nover. Dr. Start concluded that the cause of death was manual strangulation. *Id.* at p. 78. Dr. Start observed numerous factors

about the victim's physical condition, which would have made him an easy victim of a physical assault. The victim was 71 years old and obese. He had significant coronary artery disease which had resulted in bypass surgery, high blood pressure with resultant damage to the heart and kidneys, and suffered from diabetes. *Id*. at pp.75, 81-83. Dr. Start found that as a result of the manual strangulation there was a longitudinal fracture of the victim's larynx. However, there was only a single such fracture. Dr. Start opined that with such a severe injury to his throat and the resultant swelling would have left a man in Nover's condition unable to resume the struggle. *Id.* at p. 81. The doctor testified that because of the victim's severe medical problems, he would have been more vulnerable to being strangled and would have lost consciousness faster than a younger, healthier individual. *Id*. at p. 88. The doctor further indicated that if a victim were choked into unconsciousness and then the pressure immediately released, the victim would regain consciousness within several seconds—not 15 or 20 minutes. *Id*. at p. 89. Dr. Start stated that the behavior described by Petitioner to the police was inconsistent with the medical findings of his autopsy. *Id*. at p. 90. Dr. Start also found 25 ml of urine remaining in Nover's bladder after death. The doctor explained that if a person releases urine at the time of death, generally the urinary bladder would be empty. *Id*. at p. 92.

The victim's son, Marc Nover, testified that he had never heard his father use the term "gay" to describe a person's sexual identity or preferences. Trial Tr. IV, pp. 11-12. Marc Nover testified that on the only occasion where he discussed the topic with his father, Nathan Nover had referred to a pair of apparently gay men as "perverts." *Id.*

After a week-long trial, the jury deliberated for approximately ninety minutes before finding Petitioner guilty of first degree premeditated murder and carjacking. At the time of sentencing, the

trial judge made a specific point that if the juvenile statute were construed to require a finding on the record by the judge as to whether Petitioner should be sentenced as an adult or as a juvenile, the trial

judge here would have no question but that Petitioner justified treatment as an adult. Sentencing Tr. p. 41. The trial court granted Petitioner's motion to vacate the carjacking conviction on double jeopardy grounds, and sentence Petitioner to life in prison without the possibility of parole on the first degree murder conviction. *Id.*

Petitioner's conviction was affirmed on appeal. *People v. Espie,* No. 222303 (Mich. Ct. App. January 22, 2002); 672 N.W.2d 857 (Mich. 2002).

Petitioner then filed a post-conviction motion for relief from judgment pursuant to Michigan Court Rule 6.500. The trial court denied the motion for relief from judgment because the motion was in excess of twenty pages and the trial court had previously denied Petitioner's request to file a motion in excess of this page limit. *People v. Espie*, No. 99-2999 (Shiawasee County Cir. Ct. Mar. 22, 2005). The trial court subsequently denied Petitioner's motion for reconsideration. *People v. Espie*, No. 99-2999 (Shiawasee County Cir. Ct. June 8, 2005). The Michigan Court of Appeals and the Michigan Supreme Court, however, denied Petitioner's post-conviction appeal pursuant to Michigan Court Rule 6.508(D). *People v. Espie*, No. 263620 (Mich. Ct. App. Feb. 3, 2006); *appeal denied*, 722 N.W.2d 871 (Mich. 2006), *reconsideration denied*, 726 N.W.2d 30 (Mich. 2007).

Petitioner has now filed a petition for writ of habeas corpus, in which he seeks habeas relief based on the following grounds: (I) Petitioner was denied his due process rights to a fair trial where the prosecutor elicited prior bad acts evidence that was unfairly prejudicial and irrelevant to prove any of the enumerated exceptions to Michigan Rule of Evidence 404(b); (II) the prosecutor violated

Petitioner's constitutional due process right to a fair trial by engaging in repeated instances of "misconduct" by (a) expressing his personal opinion about the veracity of the testimony offered by defense witnesses, (b) denigrating the defense and remarking that he had "no idea why any normal person would choose to believe any of his story," (c) labeling Petitioner a skinhead and repeatedly emphasizing the label by asking virtually every witness what Petitioner looked like at the time the offenses were committed, (d) repeatedly making sarcastic remarks, and (e) appealing to the jurors' sympathy for the decedent; (III) the automatic waiver provision of Michigan's 1996 Juvenile Justice Reform Act, requiring an adult sentence for specified juvenile offenses committed by juveniles fourteen years of age and older, is unconstitutional because it (a) violates the separation of powers doctrine, (b) violates the equal protection clause, and (c) violates the constitutional guarantee of due process; (IV) Petitioner was denied his Sixth Amendment right to the effective assistance of appellate counsel on direct appeal; (V) Petitioner was denied his Sixth Amendment right to be provided effective assistance of trial counsel; (VI) Petitioner's constitutional right to be free from self-incrimination was violated on three occasions where law enforcement personnel coerced Petitioner into making involuntary statements; (VII) Petitioner's constitutional right to due process and trial be jury were violated where the trial court informed the jury there was probable cause to believe Petitioner was guilty and where the court invaded the province of the jury; (VIII) the trial court abused its discretion in denying Petitioner's motions for directed verdicts of acquittal; (IX) Petitioner's right to due process was denied where the great weight of the evidence was insufficient and went against the verdict; (X) Petitioner's right to be free from warrantless searches and seizures was violated where there were no exigent circumstances.

## II

Federal law provides for the issuance of a writ of habeas corpus for a prisoner in custody pursuant to the judgment of a state court if the prisoner's continued detention violates the Constitution or laws of the United States. 28 U.S.C. § 2254(a). If a particular habeas claim was previously adjudicated in a state court, it should not be granted unless the state court adjudication:

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Harpster v. State of Ohio*, 128 F. 3d 322, 326 (6th Cir. 1997).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" occurs when the state court identifies the correct legal principle from a Supreme Court decision but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

## III

Respondent contends that Petitioner's second claim and his fourth through tenth claims are procedurally defaulted for various reasons. Those claims will be addressed first.

If a state prisoner's federal habeas claims were denied in state court pursuant to an

independent and adequate state procedural rule, federal habeas review of those claims is likewise procedurally barred. The federal district court should reach the merits of the procedurally defaulted claims only if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law or that refusal to review the merits of the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Such a default may occur if the state prisoner files an untimely appeal, *Coleman*, 501 U.S. at 752, if he does not present an issue to a state appellate court at his only opportunity to do so, *Rust v. Zent*, 17 F. 3d 155, 160 (6th Cir. 1994), or if he does not comply with a state procedural rule that required him to have done something at the trial court level to preserve his claimed error for appellate review, e.g., to make a contemporaneous objection, or file a motion for a directed verdict. *United States v. Frady*, 456 U.S. 152, 167-69 (1982); *Simpson v. Sparkman*, 94 F.3d 199, 202 (6th Cir. 1996). Application of the cause and prejudice test may be excused if a petitioner "presents an extraordinary case whereby a constitutional violation resulted in the conviction of one who is actually innocent." *Rust*, 17 F.3d at 162; *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

For the doctrine of procedural default to apply, a firmly established state procedural rule applicable to the petitioner's claim must exist, and the petitioner must have failed to comply with that state procedural rule. *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001). In addition, the last state court from which the petitioner sought review must have invoked the state procedural rule as a basis for its decision to reject review of the petitioner's federal claim. *Coleman*, 501 U.S. at 729-30. "When a state court judgment appears to have rested primarily on federal law or was interwoven with federal law, a state procedural rule is an independent and adequate state ground[ ] only if the state court rendering judgment in the case clearly and expressly stated that its judgment rested on a

procedural bar." *Simpson,* 94 F.3d at 202. Whether the independent state ground is adequate to support the judgment is itself a federal question. *Lee v. Kemna,* 534 U.S. 362, 375 (2002). If the last state court from which the petitioner sought review affirmed the conviction both on the merits and, alternatively, on a procedural ground, the procedural default bar is invoked and the petitioner must establish cause and prejudice in order for the federal court to review the petition. *Rust,* 17 F.3d at 161; *See also Williams v. Withrow*, 328 F. Supp. 2d 735, 750 (E.D. Mich. 2004).

Respondent contends that Petitioner's second claim, which alleges prosecutorial misconduct, is procedurally defaulted because Petitioner did not preserve the issue by objecting at trial and as a result, the Michigan Court of Appeals reviewed the claim for plain error only. *See Espie*, Slip Op. at *3.

Michigan law requires that a criminal defendant object to prosecutorial misconduct in order to preserve such a claim for appellate review. *See Burton v. Bock*, 320 F. Supp. 2d 582, 589 (E.D. Mich. 2004) (citing *People v. Ullah*, 550 N.W.2d 568 (Mich. Ct. App. 1996)); *See also People v. Stanaway*, 521 N.W. 2d 557 (Mich. Ct. App. 1994). Petitioner does not dispute that these procedural rules were firmly established and regularly followed with respect to his prosecutorial misconduct claim before Petitioner's 1999 trial. The Michigan Court of Appeals found that by failing to object at trial, Petitioner had not preserved his claim that the prosecutor engaged in misconduct. The fact that the Michigan Court of Appeals engaged in plain error review of Petitioner's prosecutorial misconduct claim does not constitute a waiver of the state procedural default. *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). Instead, this Court should view the Michigan Court of Appeals' review of Petitioner's claim for plain error as enforcement of the procedural default. *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). The Court reviewed Petitioner's claims for plain

error and found that none of the prosecutors comments require reversal.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *See also Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996).

Petitioner contends that any procedural default of his prosecutorial misconduct claim should be excused because his trial counsel was ineffective for failing to object to the prosecutor's comments and arguments. For ineffective assistance of counsel to constitute cause to excuse a procedural default, that claim itself must be exhausted in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Although Petitioner raised several ineffective assistance of trial counsel claims in his post-conviction motion for relief from judgment,[2] Petitioner never raised a specific claim that trial counsel was ineffective for failing to object to the prosecutorial misconduct. A habeas Petitioner is required to present to the state courts "the same specific claims of ineffective assistance [of counsel] made out in the habeas petition." *Wyldes v. Hundley*, 69 F.3d 247, 253 (8th Cir. 1995) (quoting *Tippitt v. Lockhart*, 903 F.2d 552, 554 (8th Cir. 1990)). Because Petitioner's claim that counsel was ineffective for failing to object to the prosecutorial misconduct is different than the ineffective assistance of counsel claims presented his post-conviction motion, this claim was never fairly presented to the state courts. *See Caver v. Straub,* 349 F.3d 340, 346-47 (6th Cir. 2003) (citing *Pillette v. Foltz,* 824 F.2d 494, 497 (6th Cir. 1987)); *see also Brandon v. Stone*, 226 F. App'x 458, 459 (6th Cir. 2007). Because Petitioner never raised in the Michigan courts a specific claim about

---

[2] *See* Application for Leave to Appeal to the Michigan Court of Appeals[this Court's Dkt. # 12-33], Application for Leave to Appeal to the Michigan Supreme Court[this Court's Dkt.# 12-34].

trial counsel's failure to object to the prosecutorial misconduct, the alleged ineffectiveness of counsel cannot constitute cause to excuse Petitioner's default with respect to his prosecutorial misconduct claim. *See Wolfe v. Bock*, 412 F. Supp. 2d 657, 684 (E.D. Mich. 2006). Because Petitioner has not demonstrated any cause for his procedural default, it is unnecessary to reach the prejudice issue regarding these prosecutorial misconduct claims. *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983).

Respondent contends that Petitioner's fourth through tenth claims are procedurally defaulted because Petitioner raised these claims for the first time in his post-conviction motion and failed to show cause and prejudice for failing to raise these claims in his appeal of right, as required by Michigan Court Rule 6.508(D)(3). Petitioner contends that these claims are not defaulted because the trial court did not rely on Michigan Court Rule 6.508(D)(3) to deny him relief, but instead denied him relief because his motion exceeded the 20-page limit for filing motions found in Michigan Court Rule 2.119(A)(2).

In *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000), the Sixth Circuit held that a one-sentence order of the Michigan Supreme Court stating that the defendant "failed to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)" was a reasoned decision that invoked a procedural bar. The Sixth Circuit concluded that even though the ruling was brief and did not explicitly reference Michigan Court Rule 6.508(D)(3), the Michigan Supreme Court's statement was nevertheless "not unexplained." *Id.* at 407-08. The Sixth Circuit made a similar ruling in *Burroughs v. Makowski*, 282 F.3d 410, 414 (6th Cir. 2002), holding that "the Michigan Court of Appeals and Michigan Supreme Court's statements that Burroughs was not entitled to relief under M.C.R. 6.508(D) presents a sufficient explanation that their rulings were based on procedural

default."

However, in *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004), a different panel of the Sixth Circuit concluded that where the state trial court and court of appeals denied relief on the merits of the petitioner's federal claims and the Michigan Supreme Court denied relief on the basis of Michigan Court Rule 6.508(D) in general, the claims raised in the federal habeas petition were not procedurally defaulted. The Sixth Circuit explained: "given that all of the lower state courts adjudicated Abela's case on the merits, it is not at all clear that the Michigan Supreme Court's summary order relies on a procedural bar, as opposed to the non-procedural reason that Abela simply failed to meet his burden of 'establishing entitlement to the relief requested.' " *Id*. at 923.

In a case decided after *Abela* which involved nearly the same facts, the Sixth Circuit concluded that the habeas Petitioner's claims were procedurally defaulted where the Michigan Supreme Court had denied Petitioner's post-conviction appeal pursuant to Michigan Court Rule 6.508(D), even though the panel in that case did not comment about the apparent conflict in Sixth Circuit precedent regarding this issue . *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir.2004) ("Munson argues that the last explained state court judgment is the trial court's opinion denying his post-conviction motion for relief [on the merits]. . . . [H]owever, the last explained state court judgment in this case is the Michigan Supreme Court's order denying review of Munson's claims based upon his failure to comply with Rule 6.508(D).").

As the Sixth Circuit has subsequently commented, published panel opinions are binding on all subsequent panels, and a panel of the Sixth Circuit cannot overrule the decision of another panel. *See Zimmerman v. Cason*, 354 F. App'x 228, 234 (6th Cir. 2009), *cert. denied*,___ S. Ct. ___, 2010 WL 1789927 (June 14, 2010) ("*Simpson* and *Burroughs* are binding on this Court, and the Michigan

Supreme Court's order denying Zimmerman relief pursuant to MCR 6.508(D) constitutes an explained order invoking an independent and adequate procedural bar to Zimmerman's federal claims."); *Alexander v. Smith*, 311 F. App'x 875, 883-84 (6th Cir. 2009) (confirming that *Simpson* is binding precedent); *McCray v. Metrish*, 232 F. App'x 469, 478-80, n.1 (6th Cir.2007) (noting that the petitioner's claim was procedurally defaulted where Michigan Court of Appeals and Michigan Supreme Court denied appeal pursuant to Michigan Court Rule 6.508(D), even though trial court denied post-conviction motion on the merits).

*Simpson* and *Burroughs* are binding on this Court, and the Michigan Court of Appeals' and the Michigan Supreme Court's orders denying Petitioner relief pursuant to Michigan Court Rule 6.508(D) constituted an explained order invoking an independent and adequate state procedural bar to Petitioner's federal claims.

Petitioner argues that appellate counsel was ineffective for failing to raise Petitioner's post-conviction claims on his appeal of right. Petitioner, however, has not shown that appellate counsel was ineffective.

It is well-established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983).

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the . . . goal of vigorous and effective advocacy. . . . Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id.* at 754.

Moreover, "[a] brief that raises every colorable issue runs the risk of burying good arguments—those that, in the words of the great advocate John W. Davis, 'go for the jugular,'—in a verbal mound made up of strong and weak contentions." *Id.* at 463 U.S. at 753 (citations omitted). Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *Smith v. Murray*, 477 U.S. 527, 536 (quoting *Barnes*, 463 U.S. at 751-52). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002). Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," which is defined as an issue which was obvious from the trial record and would have resulted in a reversal on appeal. *See Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

Petitioner has not demonstrated that his appellate counsel's performance fell outside the wide range of professionally competent assistance by failing to raise his fifth through tenth claims in his direct appeal. Petitioner was represented by an assistant defender from the Michigan State Appellate Defender's Office, who filed a fifty page brief on appeal which raised four claims. One of those claims, the prosecutorial misconduct claim, contained five subclaims, and Petitioner's sentencing claim contained three subclaims.[3] Petitioner has not shown that appellate counsel's strategy in presenting such claims and not raising other claims was deficient or unreasonable. Moreover, none of the claims raised by Petitioner in his post-conviction motion were "dead bang winners." Because

---

[3] *See* Brief on Appeal[this Court's Dkt. # 12-29, 12-30].

the defaulted claims are not "dead bang winners," Petitioner has not established cause for his procedural default of failing to raise his remaining claims on direct review. *See McMeans v. Brigano*, 228 F.3d 674, 682-83 (6th Cir. 2000); *Meade*, 265 F. Supp. 2d at 872. Because Petitioner has not demonstrated any cause for the procedural default of the claims that he raised for the first time before the state courts on post-conviction review, it is unnecessary to reach the prejudice issue. *Smith*, 477 U.S. at 533; *Long*, 722 F.2d at 289.

Petitioner further argues that even if his second and his fourth through tenth claims are procedurally defaulted, the Court should nonetheless consider the merits of these claims on the ground that Petitioner is actually innocent of these crimes, because he lacked the *mens rea* or intent to commit the crimes.

In an extraordinary case, where a constitutional error has probably resulted in the conviction of one who is actually innocent, a federal court may consider the constitutional claims presented even in the absence of a showing of cause for procedural default. *Murray v. Carrier*, 477 U.S. 478, 479-80 (1986). However, to be credible, such a claim of innocence requires a petitioner to support the allegations of constitutional error with new reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). A petitioner must also show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. Actual innocence, which would permit collateral review of a procedurally defaulted claim, means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998).

In support of his actual innocence claim, Petitioner references to reports from two psychologists, Dr. Mark R. Lovell and Dr. Douglas H. Ruben, which were prepared prior to Petitioner's trial for Petitioner's trial counsel, but never introduced by counsel at trial. The reports

were introduced at sentencing. In a supplemental report prepared by Dr. Ruben on July 9, 1999, the psychologist opines that Petitioner may have been acting under an "irresistable impulse" when he attacked the victim after the victim had made sexual advances towards him. Dr. Ruben believed that due to Petitioner's "homophobic and physical abuse history," Petitioner exhibited neither criminal intent nor did he "methodically and assidously" plan his escape from the juvenile facility nor plan for the murder.[4]

Petitioner's argument does not present a colorable claim of actual innocence. First, the psychologists reports are not newly discovered evidence; it is undisputed that these reports were available to Petitioner at the time of trial. *See Nance v. Norris,* 392 F. 3d 284, 291 (8th Cir. 2004). As a result, they cannot support his claim that a manifest injustice will result if the procedural default is not excused.

Second, the reports offered by Petitioner do not establish Petitioner's actual innocence to the crime, because they do not take into account Petitioner's deliberate and active role in the events leading up to the murder, as well as his activities after the killing. *See Harris v. Lindamood*, 355 F. App'x 940, 942-43 (6th Cir. 2009) (concluding sufficient evidence supported the petitioner's intent to commit the predicate offenses of robbery, kidnapping, or murder for felony murder offense, thus precluding habeas relief based on defendant's actual innocence).

Several witnesses testified that Petitioner had told them before the day of the murder that he intended to escape from the juvenile detention facility. Petitioner told Alex Barich that he was going to slip out of his handcuffs as he had done before and he was going to steal a car. Petitioner told

---

[4] See Psychological Evaluation Report, dated July 9, 1999, p. 6, attached to the Petition for Writ of Habeas Corpus.

Barich that he intended to go to Florida after escaping. Although Petitioner claims that he killed the victim in self-defense, Petitioner went on a shopping spree with the victim's credit cards after the killing rather than report the crime to police or seek other assistance. Moreover, Petitioner's story was inconsistent with the physical evidence. For example, although Petitioner claimed that the victim urinated during the assault, there was no smell of urine in the car. Petitioner's claim that the victim lost consciousness after being choked the first time but revived a number of minutes later was refuted by the medical examiner. The medical examiner further indicated that if pressure were removed from a person's neck, that person would regain consciousness quickly, not a number of minutes later. Although Petitioner claimed that he dumped the victim's body at the side of a road, the victim's body was found approximately ten feet off the side of the road and his body had been covered with a layer of leaves that was not a natural accumulation. Sgt. Mainstone testified that based on his fifteen years of experience as a state police detective, it was his opinion that a serious effort had been made to conceal the victim's body. The police did not find any sign of a struggle in the automobile, and perhaps most importantly, after stopping the interrogation, Petitioner spontaneously asked Detective Manley, "do you think I'm gonna say I killed him for the hell of it?" The statement implies Petitioner's molestation and self defense narrative was contrived.

Petitioner's attempts to conceal the victim's body, his use of the victim's credit card and automobile subsequent to the murder, and evidence that he fabricated the self-defense claim all lead to a reasonable inference that Petitioner planned and intentionally carried out the murder. The only evidence of self-defense or lack of intent is the psychologist's report, which is based on Petitioner's own statements. The reports do not excuse the procedural default. *Glass,* 65 F. 3d at 17. Because Petitioner has not presented any new reliable evidence that he is innocent of these crimes, a

miscarriage of justice will not occur if the Court declined to review Petitioner's procedurally defaulted claims on the merits. *Wolfe*, 412 F. Supp. 2d at 684.

Finally, assuming that Petitioner had established cause for his default, he would be unable to satisfy the prejudice prong of the exception to the procedural default rule because his claims would not entitle him to relief. The cause and prejudice exception requires proof of both cause and prejudice. *See Matthews v. Ishee*, 486 F. 3d 883, 891 (6th Cir. 2007). In light of the overwhelming evidence of guilt in this case, Petitioner has failed to show that he would be prejudiced by this Court's refusal to review the merits of his procedurally defaulted claims. Petitioner is not entitled to habeas relief on his second and fourth through tenth claims.

To the extent that Petitioner is raising his ineffective assistance of appellate counsel claim as an independent ground for relief, he is not entitled to the issuance of a writ of habeas corpus. Petitioner is unable to show that he was prejudiced by appellate counsel's decision not to raise the fifth through tenth claims on his appeal of right, in light of the fact that these same claims were presented to the Michigan appellate courts on Petitioner's post-conviction motion for relief from judgment and rejected by them. *See Hollin v. Sowders*, 710 F.2d 264, 265-67 (6th Cir. 1983); *Johnson v. Warren*, 344 F. Supp. 2d 1081, 1096 (E.D. Mich. 2004); *Bair v. Phillips*, 106 F. Supp. 2d 934, 938, 943 (E.D. Mich. 2000). The state courts' rulings on Petitioner's motion for post-conviction relief granted Petitioner an adequate substitute for direct appellate review and therefore his attorney's failure to raise these additional claims on Petitioner's appeal of right did not cause him any injury. *Bair*, 106 F. Supp. 2d at 943 (citing *Gardner v. Ponte*, 817 F. 2d 183, 189 (1st Cir. 1987)). In this case, it is unnecessary to remand this case to the state courts to reconsider a case that they have already adversely decided on more than one occasion. *Gardner*, 817 F.2d at 189. Petitioner is

therefore not entitled to habeas relief on his second and fourth through tenth claims.

## IV

In his first claim, Petitioner contends that the prosecutor deprived him of a fair trial by introducing "prior bad acts" evidence that Petitioner had previously stolen his mother's van and bank checks, wrote the checks without permission, and fled from the state of Michigan with his fourteen-year-old girlfriend, claiming that this evidence was inadmissible pursuant to Michigan Rule of Evidence 404(b).

Federal habeas corpus relief does not lie for errors of state law. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not reviewed by a federal habeas court. *Seymour*, 224 F.3d at 552.

Petitioner's claim that the state court violated Rule 404(b) by admitting this evidence is non-cognizable on habeas review. *See Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007). There is no clearly established Supreme Court precedent providing that a state violates a habeas Petitioner's due process rights by admitting propensity evidence in the form of "prior bad acts" evidence. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Adams v. Smith*, 280 F. Supp. 2d 704, 716 (E.D. Mich. 2003). Likewise, Petitioner's claim that this evidence was irrelevant does not raise due process issues of constitutional magnitude or entitle him to habeas corpus relief. *See Oliphant v. Koehler*, 451 F. Supp. 1305, 1308 (W.D. Mich. 1978). Finally, appraisals of the probative and prejudicial value of evidence are entrusted to the sound discretion of a state trial court judge, and a federal court considering a habeas petition must not disturb that appraisal absent an error of constitutional dimensions. *See Dell v. Straub*, 194 F. Supp. 2d 629, 645 (E.D. Mich. 2002). There was no such error here. Petitioner is therefore not entitled to habeas relief on his first claim.

**V**

Petitioner's third claim, the final issue before this Court, challenges the constitutionality of the Michigan 1996 Juvenile Justice Reform Act, Mich.Comp. Laws § 769.1, which requires that a juvenile defendant to be tried and sentenced as an adult for certain enumerated offenses, including first-degree murder. Petitioner contends that the law is unconstitutional, because the statute no longer gives a state trial judge the option to sentence the defendant as a juvenile, but instead, requires that the defendant be sentenced as an adult.

Notably, "[t]here is no constitutional right to any preferred treatment as a juvenile offender." *Steele v. Withrow*, 157 F. Supp.2d 734, 740 (E.D. Mich. 2001) (citing *Stokes v. Fair*, 581 F.2d 287, 289 (1st Cir. 1978); *People v. Hana*, 504 N.W.2d 166 (Mich. 1993)). Therefore, in most cases, the question of whether a defendant is to be charged as an adult criminal or a juvenile delinquent is one of prosecutorial discretion devoid of most due process guarantees. *Id*. at 740-41. Neither the Due Process Clause, nor the Supreme Court's conclusions in *Kent v. United States*, 383 U.S. 541 (1966), and *In Re Gault*, 387 U.S. 1 (1967), prevent a state from automatically requiring that juveniles charged with certain offenses be tried and sentenced as adults, nor is a judicial waiver of juvenile court jurisdiction required for those types of offenses. *See Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001) (noting that a state court's determination that state law mandating that juveniles between ages of 15 and 17 charged with commission of specified crimes be tried and sentenced as adults did not violate due process was not contrary to or unreasonable application of clearly established federal law). Petitioner has not shown that the use of Michigan's automatic waiver statute by the prosecutor to try him as an adult in circuit court violated any clearly established federal law that would entitle him to habeas relief. *See Friday v. Pitcher*, 99 F. App'x 568, 575 (6th Cir. 2004);

*see also Middlebrooks v. Berghuis*, No. 2007 WL 679886, * 3 (W.D. Mich. Mar. 1, 2007) (collecting cases).[5] Petitioner is not entitled to habeas relief on his third claim.

## VI

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. *Id.* at 336-37.

Likewise, when a district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claims, a certificate of appealability should issue if the petitioner shows that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack*, 529 U.S. at 484. When a plain

---

[5] Nor would the Supreme Court's recent decision in *Graham v. Florida*, 130 S. Ct. 2011 (2010), be helpful to Petitioner's cause. In *Graham*, the Court concluded that states violate the Eighth Amendment when they sentence juveniles to life imprisonment for non-homicide crimes but it placed no Eighth Amendment limits on prison terms resulting from homicide convictions.

procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petition should be allowed to proceed further. In such a circumstance, no appeal would be warranted. *Id.* It is appropriate to grant or deny the certificate of appealability at this time. *See* Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

Petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability is not warranted in this case. Petitioner should not be permitted to proceed in forma pauperis on appeal, as any appeal would be frivolous. *See* Fed. R. App. P. 24(a).

## VII

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims contained in his petition.

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus [Dkt # 1] is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED**.

It is further **ORDERED** that permission to proceed in forma pauperis on appeal is **DENIED**.


s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge


Dated: July 28, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 28, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS